IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,506

STATE OF KANSAS,
*Appellee*,

v.

SARAH GONZALES McLINN,
*Appellant.*

SYLLABUS BY THE COURT

1.

Under K.S.A. 2013 Supp. 21-5209, a criminal defendant may present a mental disease or defect defense to establish he or she lacked the culpable mental state required as an element of the charged crime. In turn, K.S.A. 2013 Supp. 21-5202(a) defines the phrase "culpable mental state" as including conduct performed "intentionally," "knowingly," or "recklessly." It does not list premeditation as a culpable mental state. Consequently, a district court does not err by omitting any reference to premeditation in a jury instruction regarding the defense of mental disease or defect.

2.

Second-degree intentional murder is a lesser included offense of first-degree premeditated murder.

3.

Under K.S.A. 2013 Supp. 22-3414, a district court should instruct the jury on a lesser included offense if there is some evidence that would reasonably justify a conviction of the lesser included crime. To determine whether this standard has been met, the district court should consider whether there is some evidence, when viewed in the

1

light most favorable to the defendant, that would allow a rational factfinder to find the defendant guilty of the lesser included offense.

4.

A district court does not err by instructing a jury both (1) that its only concern is to determine if the defendant is guilty or not guilty and (2) that a defendant found not guilty solely because of a mental disease or defect will be committed to the state security hospital for safekeeping and treatment until discharged according to law.

5.

A district court does not err by refusing to allow a closing argument that a defendant would be fine with a second trial because the remark could be interpreted as encouraging jurors to violate their oath to return a verdict based solely on the evidence and to instead consider the consequences of a divided verdict.

6.

A single error will not constitute cumulative error.

7.

Under the facts of this case, sufficient evidence was presented of an especially heinous, atrocious, or cruel murder.

8.

A district court does not abuse its discretion by declining to define heinous, atrocious, or cruel when instructing the jury.

9.

K.S.A. 2013 Supp. 21-6624(f) is not unconstitutionally vague even though it defines an aggravating circumstance allowing for a hard 50 sentence as behavior that is *especially* heinous, atrocious, or cruel but describes behavior that is merely—rather than especially—heinous, atrocious, or cruel. The statute still provides a standard for heinous, atrocious, or cruel behavior and then indicates that standard must be especially met.

10.

A defendant to whom a statute may constitutionally be applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally in circumstances not before the court.

11.

Under the facts of this case, a district court did not abuse its discretion by denying a defendant's request to be sentenced to a hard 25 life sentence.

12.

If a defendant is sentenced under K.S.A. 2013 Supp. 21-6620(d)(6) and K.S.A. 2013 Supp. 21-6623, a district court errs by imposing postrelease supervision rather than parole.

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed January 26, 2018. Affirmed in part, vacated in part, and remanded with directions.

*Samuel D. Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Charles E. Branson*, district attorney, argued the cause, and *Kate Duncan Butler*, assistant district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  In January 2014, Sarah Gonzales McLinn confessed to law enforcement officers that she killed Hal Sasko. At her trial on a charge of first-degree premeditated murder, McLinn did not deny that she killed Sasko but argued she was not criminally responsible because a mental disease or defect prevented her from forming the culpable mental state necessary to convict her of the charge. The jury nonetheless convicted McLinn of first-degree premeditated murder. Then, during the sentencing proceeding, the jury determined McLinn murdered Sasko in an especially heinous, atrocious, or cruel manner, and the district court ultimately imposed a hard 50 life sentence.

On appeal, McLinn raises numerous arguments which relate to her mental disease or defect defense, including several jury instruction issues. McLinn contends these and other errors require us to reverse her conviction. Although we determine the district court committed one instructional error, we determine the error was harmless and we affirm McLinn's conviction.

McLinn also raises five issues arising from sentencing proceedings. We reject all but one of McLinn's sentencing issues:  The district court erred in ordering postrelease supervision rather than parole. To remedy this error, we remand this case to the district court for resentencing.

FACTS AND PROCEDURAL BACKGROUND

A police officer discovered Sasko's body inside his Lawrence home on January 17, 2014. Sasko's hands were bound with zip ties. Other zip ties, some used and cut and some

4

unused, were scattered near his feet. The police observed blood patterns and drops throughout the house and a blood smear above Sasko's head. Beer cans were strewn about, and three of them contained residue from a sleeping pill. A toxicology analysis on Sasko's system showed sleeping pills in an intoxicating concentration. A forensic pathologist testified at trial that Sasko died of stab and slicing wounds to his neck and that Sasko had no defensive wounds. The pathologist offered detailed testimony about the gruesome nature of the injury; suffice it to say, here, that McLinn cut through Sasko's neck and cut or sawed through most of the soft tissue surrounding the spine.

Sasko's car was missing, as was McLinn's dog, and when the police discovered McLinn's cell phone on the kitchen counter they became concerned she had been kidnapped. The police immediately began looking for McLinn and issued a nationwide alert for Sasko's car.

The police learned Sasko's car entered the Kansas turnpike early in the morning on January 14, 2014, and exited the turnpike near the Oklahoma border later that morning. Later, McLinn's family alerted the police she had tried to call her grandmother; those phone calls originated from convenience stores along the route from Kansas to Texas. Video surveillance showed it was McLinn, alone, who had made those calls, and the police eventually determined McLinn was a person of interest in the homicide. About a week later, Lawrence police officers learned the National Park Service had taken McLinn into custody near Miami, Florida.

A Lawrence police detective interviewed McLinn in Florida for about three hours on January 26, 2014. At trial, the detective testified McLinn indicated she knew the interview was about Sasko's death, and she told the detective she had killed Sasko because she wanted to see how it felt to kill someone. She elaborated on the preparations she had made in advance of killing Sasko, which included falsely covering her absence

5

from work and gaining time to get out of town by telling her coworkers she had a death in the family. As for the actual murder, McLinn explained she crushed up some sleeping pills and put them in Sasko's beer. Later, Sasko stood up, stumbled, and passed out face-first on the floor. McLinn zip-tied Sasko's ankles and wrists while he was unconscious, but, as she tied Sasko's wrists, he woke up and mumbled something and then passed out again. McLinn told the detective she was having second thoughts at that point, but, according to the detective, she "resigned herself that she was going to kill Mr. Sasko and continued to bind his wrists." McLinn retrieved a hunting knife from her bedroom and knelt near Sasko's head. She felt for Sasko's carotid artery and then "plunged the knife into his neck until it hit something, which she believed was the carpet." Then, using both hands in "a sawing motion," she "pulled the knife towards her so that it cut his neck." McLinn told the detective she had thoughts of killing someone for two years and "resigned on Mr. Sasko within five days preceding the murder."

After McLinn was charged with premeditated first-degree murder, she raised the defense of mental disease or defect. She alleged she suffered from dissociative identity disorder, or DID, which used to be known as "multiple personality disorder." The defense's expert witness, Dr. Marilyn Hutchinson, introduced the phrase "System of Sarah," which she explained was "not uncommon nomenclature for people who work with [DID]." Dr. Hutchinson talked to four personalities or identities in McLinn's case—Alyssa, Vanessa, Myla, and No Name. Dr. Hutchinson explained that when she used the phrase "System of Sarah," she was referring to "all of the personality parts and fragments that reside in the body known as Sarah McLinn."

Dr. Hutchinson testified she had met with McLinn several times over several months, for a total of 17.5 hours. In the beginning, Dr. Hutchinson noticed McLinn had "some unusual language patterns"—she "sometimes referred to herself in the plural, 'we,' 'us,'"—and there were unusual gaps in her memory. Dr. Hutchinson "began to suspect

6

that there was something other than depression or anxiety." She administered several standardized tests and also performed a clinical interview, which she designed to test for DID by using an interview structure set out in the Diagnostic of Statistical Medicine (DSM-V).

Dr. Hutchinson ultimately diagnosed McLinn with, among other things, DID. Dr. Hutchinson explained that this diagnosis did not describe a person with "this sort of collection of personalities, sort of like this is a family that is all walking around in one body." Instead, "it really is more like the person's identity, who they are, the self, . . . there isn't a one person there, that the self is in fragments. That self is dissociated or split apart into pieces and there is not a whole."

Dr. Hutchinson then explained the criteria for a DID diagnosis, as set forth in the DSM-V. "The major criteria is a disruption of identity characterized by two or more distinct personality states," she began, and "[i]t involves marked discontinuity in the sense of self and sense of agency." According to Dr. Hutchinson, "The discontinuity and sense of self, the sense of agency, their perception, their cognition or their sensory motor functioning"—"everything"—could be affected by disruption of identity. Dr. Hutchinson also opined McLinn met the two secondary DSM-V criteria for DID: First, she had "recurrent gaps in the recall of everyday events because what one person does, one personality, one piece of the identity does isn't usually known by the others. Sometimes they know, but that clearly isn't always true." Second, she exhibited "clinically significant . . . stress or impairment" caused by the symptoms; Dr. Hutchinson explained "you can't just have [DID]. It has to matter."

Dr. Hutchinson offered extensive testimony about McLinn's mental health history, drug and alcohol use, childhood trauma, family experiences, sexual abuse, her relationship with Sasko, mental health medications, and her performance on diagnostic

7

and mental status tests. Highly summarized, Dr. Hutchinson offered her opinion that McLinn could not form intent. She explained that "forming an intent is a rational thought" and McLinn "did not have the capability of a rational thought because she didn't, at the time of that, have access to all the parts of her that would go into making a rational choice like it works for the rest of us."

Vanessa, who was "quiet, soft-spoken, apologetic, often tearful, horrified at what had happened, scared," was going to commit suicide to escape her circumstances with Sasko. Myla, who was more confident than Vanessa and whose role "was to be the mother of Vanessa because Vanessa couldn't take care of herself," communicated Vanessa's suicide plans to the System of Sarah. Alyssa did not want Vanessa to "kill all of us," and Alyssa's only idea to get out of the situation was to kill Sasko. According to Dr. Hutchinson, "Alyssa . . . perceived the greatest act of love she could do to protect the rest of the System was to kill Mr. Sasko." Dr. Hutchinson explained that Alyssa drugged Sasko and bound him, but it was Vanessa who briefly regained control and cut the ties. Then Alyssa took over, retied Sasko's hands, and killed him.

Dr. Hutchinson also testified that "premeditation has, by definition, malice and aforethought, and without respect for life, and it was my conclusion that Alyssa made the choice that to save the life of the System, she had to take the life of Mr. Sasko." At the State's request, the district court admonished the jury to disregard Dr. Hutchinson's statement about the definition of premeditation, as it would instruct the jury on the law later, "and the definition given [by Dr. Hutchinson] is a bit contrary to the law."

The State had asked Dr. William Logan, a physician and clinical psychiatrist, to evaluate McLinn and give his professional opinion as to whether she was capable of forming the intent to kill Sasko. At trial, Dr. Logan testified he did not find "any mental disorder that rose to the level that it would have prevented her from forming intent." He

8

noted that the DSM-V carried cautionary instructions for its use in forensic settings, notably that a "diagnosis alone doesn't equate to any one particular legal conclusion because diagnoses vary in severity and the diagnosis alone doesn't, by itself, tell you how that individual is able to function in that particular setting or what they are capable of doing."

Dr. Logan, like Dr. Hutchinson, found McLinn's personal history "significant in that she had undergone a number of traumas," including being molested by a neighbor when she was a young child and dealing with her parents' divorce. He also testified that McLinn's schooling experience was "difficult" because a period of early homeschooling left her "kind of deficient in social interaction" and then she attended numerous different schools over the years, which forced her to make "a number of transitions."

Dr. Logan testified he had reviewed Dr. Hutchinson's report, and "[t]he significant thing about the report," he explained, was that "she really didn't explain how the [DID diagnosis] went to the issue of whether or not Miss McLinn could form intent"—although he acknowledged the report was later amended. Dr. Logan did not have strong opinions about whether McLinn had DID. "I think certainly it's a possibility," he stated, and, "I don't know that I could confirm it but I respect Dr. Hutchinson and she spent a great number of hours with [McLinn]." He also stated, "I certainly think at this juncture Miss McLinn believes she has the disorder." In Dr. Logan's opinion, McLinn had a strong history for depression and anxiety, some reported symptoms consistent with post-traumatic stress disorder, and "it is possible that she has [DID]." In short, Dr. Logan was "open" to Dr. Hutchinson's diagnosis, but he "didn't think that it reached the level that it prevented her from forming an intent to kill Mr. Sasko." In his opinion, "with a reasonable medical certainty," McLinn could form intent to kill Sasko on January 14, 2014.

9

The jury found McLinn guilty of first-degree premeditated murder. The district court then informed the jury there would be a separate penalty phase proceeding, as the State had previously given notice of its intent to seek a hard 50 sentence. The jury thereafter found McLinn committed murder in an especially heinous, atrocious, or cruel manner. The district court ultimately sentenced McLinn to life imprisonment, without possibility of parole for 50 years, followed by lifetime postrelease supervision. McLinn appealed the guilty verdict, the denial of her motion for a new trial, and her sentence.

GUILT PHASE ISSUES

McLinn raises five guilt phase issues. The first two, both of which object to jury instructions, hinge on "intent"—what intent was needed to establish criminal liability and what evidence of McLinn's intent was demonstrated or supported at trial. McLinn's third argument, also a jury instruction issue, asks whether the jury should have been allowed to consider the disposition of her case—specifically, whether she would be able to get help for her mental illness in prison—in determining her guilt. McLinn then raises an issue of potential error in the closing statements:  She argues the district court erred by limiting her counsel from telling the jury she would not mind a second trial. Then, in her final guilt phase issue, she argues cumulative error denied her a fair determination of her guilt.

GUILT PHASE ISSUE 1: *The District Court's Mental Disease or Defect Instruction Was Not Clearly Erroneous.*

We first address McLinn's argument regarding the jury instruction that addressed her mental disease or defect defense—Instruction 13. To put that instruction and McLinn's argument in perspective, it helps to review a total of six jury instructions. Some of these instructions relate to McLinn's mental disease or defect defense and others to the State's burden of proof.

10

In the order presented to the jury, the first of these instructions, Instruction 7, informed the jury of the basic contours of McLinn's mental disease or defect defense and discussed burden of proof in the context of the defense. It provided: "The defendant raises mental disease or defect as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

The next three involved instructions—Instructions 10, 11, and 12—drill down on the specifics of the State's burden of proof. Instruction 10 delineated the elements the State had to prove to establish that McLinn had committed premediated first-degree murder:

"The defendant is charged with murder in the first degree. . . .
"To establish this charge, each of the following claims must be proved:
"1. The defendant intentionally killed Harold M. Sasko.
"2. The killing was done with premeditation.
"3. This act occurred on or about the 14th day of January, 2014, in Douglas County, Kansas."

Instruction 11 explained the first of these enumerated elements—the State's burden to prove McLinn intentionally killed Sasko: "The State must prove that the defendant committed the crime intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

Instruction 12 explained the second enumerated element and what was encompassed in the State's burden to prove that the killing was done with premeditation: "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time

period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

The last two relevant instructions loop back to McLinn's mental disease or defect defense that had been presented in Instruction 7. According to Instruction 13, which is at the heart of McLinn's argument:

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. This evidence is to be considered only in determining whether the defendant had the culpable mental state required to commit the crime. The defendant is not criminally responsible for her acts if because of mental disease or defect the defendant lacked the intent to kill Harold M. Sasko.

"A defendant acts intentionally when it is a defendant's desire or conscious objective to do the act complained about by the state."

Instruction 14 informed the jury that if it found McLinn

"not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required culpable mental state, then the defendant is committed to the State Security Hospital for safekeeping and treatment until discharged according to law."

*The Parties' Arguments*

McLinn mainly takes issue with the sentence in Instruction 13 that instructed the jury she could not be held "criminally responsible for her acts if because of mental disease or defect [she] lacked the intent to kill Harold M. Sasko." For the first time on appeal, she contends the district court should have included premeditation in this statement, so that the instruction would have provided that McLinn was "not criminally

responsible for her acts if because of mental disease or defect [she] lacked the intent to kill Harold M. Sasko *or the ability to premeditate the killing*," or some similar variant of the italicized language.

She justifies this proposed wording by arguing "premeditation requires rational thought processes that go beyond an intent to cause a particular result." Given that requirement, she argues the jury could have found that McLinn's "fragmented psyche prevented her from rationally reflecting upon the decision to kill Mr. Sasko"—especially since the System of Sarah "was far from unified" about the desirability of Sasko's death. Stated another way, McLinn primarily argues that premeditation requires rational reflection on the act of killing, and her "mental disease or defect defense called into doubt whether she was capable of such rational thought." If the jury accepted Dr. Hutchinson's testimony about her psyche, she explains, it likely would have found McLinn incapable of forming the rational thought necessary for premeditation. She argues the district court, by using Instruction 13 to limit the reach of her mental disease or defect defense to only the element of intent, prevented the jury from considering whether her mental disease prevented her ability to premeditate.

The State agrees "premeditation is clearly a state of mind." It also acknowledges some defendants, in situations similar to McLinn's, use the mental disease or defect defense to challenge both the premeditation and intent elements. But it argues McLinn cited no cases explicitly or implicitly *requiring* the district court to include both premeditation and intent in the mental disease or defect instruction. In McLinn's case, the State argues, such an instruction would not have been factually appropriate because at trial both parties primarily focused on whether McLinn could form intent, not premeditation. In any event, however, the State contends that even if Instruction 13 was erroneous McLinn suffered no prejudice.

13

*Standard of Review*

In essence, McLinn argues that Instruction 13, as given, misled the jury and was not legally or factually appropriate. See *State v. Seba*, 305 Kan. 185, 192, 380 P.3d 209 (2016).

When analyzing jury instruction issues, we follow a three-step process:

> "(1) determining whether the appellate court can or should review the issue, *i.e.,* whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed harmless." *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

See also, e.g., *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016) (listing four steps, in which the second step is split into considering two types of errors).

The "first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect [this court's] reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015).

Applying the first step, there is no dispute McLinn did not object to the instruction now at issue. "When a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous." *State v. Knox*, 301 Kan. 671, 680, 347 P.3d 656 (2015); see K.S.A. 2013 Supp. 22-3414(3).

At the second step, in determining whether an error actually occurred, we "consider whether the subject instruction was legally and factually appropriate,

14

employing an unlimited review of the entire record." *Williams*, 295 Kan. 506, Syl. ¶ 4; see *State v. Plummer*, 295 Kan. 156, 160-63, 283 P.3d 202 (2012).

At the third step, which is our reversibility inquiry when applying the clear error standard, we will only reverse the district court if an error occurred and we are "'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Knox*, 301 Kan. at 680 (quoting *Williams*, 295 Kan. 506, Syl. ¶ 5); see *State v. Tahah*, 302 Kan. 783, 793, 358 P.3d 819 (2015) (explaining the clear error standard is in reality a heightened standard of harmlessness, and less of a standard of review). The party claiming a clear error has the burden to demonstrate the necessary prejudice. *Knox*, 301 Kan. at 680.

*Analysis*

We conclude the district court did not error by limiting Instruction 13 to the element of intent. The instruction was appropriate as given and would have been inappropriate if changed to the wording McLinn apparently proposes—"The defendant is not criminally responsible for her acts if because of mental disease or defect the defendant lacked the intent to kill Harold M. Sasko *or the ability to premeditate the killing*." The State's concession that premeditation is a mental state and, thus, impliedly its concession that the instruction would have been appropriate, although not required, does not bind our review of this legal issue. See *Ritchie Paving, Inc. v. City of Deerfield*, 275 Kan. 631, 641, 67 P.3d 843 (2003) ("Stipulations as to what the law is are not effective and not controlling on this court.").

McLinn's argument is rooted in the pattern instruction relating to the mental disease or defect defense, which concludes with these words: "if because of mental disease or defect the defendant lacked the [*set out the particular mental state which is an*

15

*element of the crime or crimes charged*]." PIK Crim. 4th 52.120. This italicized wording broadly refers to "mental state," and our caselaw has occasionally referred to premeditation as a mental state—one part of the mental state inquiry. See *State v. Jones*, 279 Kan. 395, 404, 109 P.3d 1158 (2005) ("While the evidence points to [the defendant] as the perpetrator, legitimate questions exist as to his state of mind at the time of the murder, *i.e.*, whether [the victim] was killed with premeditation or simply with intent, however prolonged."). McLinn thus reasons, after considering the pattern instruction and our precedent, that the jury should have been instructed to consider whether her mental disease or defect prevented her from being able to premeditate killing Sasko.

Despite the broad language in PIK and our caselaw, we conclude the precise question under Kansas' current statutes is not whether premeditation is a "mental state" but whether it is by legal definition a "*culpable* mental state." The Legislature has provided for this precise and focused inquiry in the current mental disease or defect defense statute, which became effective July 1, 2011 (more than two years before Sasko's murder). That statute, K.S.A. 2013 Supp. 21-5209, states: "It shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the *culpable* mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." (Emphasis added.) In turn, K.S.A. 2013 Supp. 21-5202(a) provides that "[a] culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'" Premeditation is not listed as a "culpable mental state."

Of these three listed statutory culpable mental states, "intentionally" is the only one used in the statutory elements of first-degree premeditated murder. And, in turn, "intentionally" is the only culpable mental stated used in Instruction 10, which sets out the elements of first-degree premeditated murder as particularized to the facts of this case. See K.S.A. 2013 Supp. 21-5209. The district court's jury instructions incorporated

these concepts through Instruction 7 (directing the jury to consider McLinn's defense), Instruction 11 (defining "intent" as McLinn's desire or conscious objective to do the act), and Instruction 13 (instructing the jury that McLinn was "not criminally responsible for her acts if because of mental disease or defect the defendant lacked the intent to kill Harold M. Sasko").

McLinn essentially asks this court to broaden the legislatively enacted definition of "culpable mental state" to include premeditation, but she offers no authority for us to do so. And indeed, as we frequently reiterate, courts "read the language as it appears, without adding or deleting words" to unambiguous statutes. *Landrum v. Goering*, 306 Kan. 867, 872-73, 397 P.3d 1181 (2017). Applying that rule here, we perceive no ambiguity in the Legislature's limitation of the mental disease or defect defense to culpable mental states, a statutorily defined term. K.S.A. 2013 Supp. 21-5209. Nor is there ambiguity in K.S.A. 2013 Supp. 21-5202(a)'s limitation of the phrase "culpable mental state" to actions made intentionally, knowingly, or recklessly.

Instead of offering authority for expanding the current statutory definition of "culpable mental state," McLinn focuses on our past decisions involving the mental disease or defect defense, intent, and premeditation. As we previously noted, these decisions occasionally refer to premeditation as part of a "state of mind inquiry" and impliedly or explicitly approve instructions informing the jury that a defendant was not responsible for his or her acts if "'because of mental disease or defect the defendant lacked the *premeditation and intent* required for first-degree murder.'" (Emphasis added.) *State v. White*, 279 Kan. 326, 333, 109 P.3d 1199 (2005) (*White I*); see also *State v. White*, 284 Kan. 333, 345, 161 P.3d 208 (2007) (*White II*); *State v. Henry*, 273 Kan. 608, 619, 44 P.3d 466 (2002). But see *State v. Washington*, 275 Kan. 644, 675, 68 P.3d 134 (2003) (court instructed "'the defendant is not criminally responsible for his acts if

17

because of mental disease or defect the defendant lacked the necessary element of intent to kill'").

These decisions, however, were decided under the previous version of the mental disease or defect defense statute, K.S.A. 22-3220. Under that version, it was a defense to prosecution "that the defendant, as a result of mental disease or defect, lacked the *mental state* required as an element of the offense charged." (Emphasis added.) K.S.A. 22-3220 (repealed July 1, 2011). This earlier version did not use the wording "*culpable* mental state."

Moreover, even under these earlier cases, premeditation is more properly understood as a temporal consideration to the mental state of intent: Premeditation "means to have thought the matter over beforehand," meaning "to have formed the design or intent to kill before the act." In other words, our premeditation inquiry asks *when* the intent to kill was formed. *State v. Hebert*, 277 Kan. 61, 88, 82 P.3d 470 (2004) ("'[T]he concept of premeditation requires more than the instantaneous, intentional act of taking another's life.'" [quoting PIK Crim. 3d 56.04(b)]); see also PIK Crim. 4th 54.110 (requiring the State to prove the defendant "intentionally killed" the victim and the killing "was done with premeditation"); *Knox*, 301 Kan. at 681 ("'Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation.'" [quoting *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014)]).

For example, when we referred to premeditation as a mental state in *Jones*, one of the cases McLinn cites, we did so in the context of whether Samuel Jones, Jr., formed the intent to kill before he killed his victim by strangulation or whether he merely acted with intent to kill formed at the time of death. See *Jones*, 279 Kan. at 402 ("We begin by

18

observing that premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct.").

McLinn counters by pointing to the portion of *Jones* where this court asserted premeditation "means something more than the instantaneous, intentional act of taking another's life." *Jones*, 279 Kan. at 402. This "something more" does not refer to a heightened culpable mental state other than "intentionally," however. Instead, the "something more" means that intent cannot be formed in the instant of the act. See *State v. Saleem*, 267 Kan. 100, 105, 977 P.2d 921 (1999) (identifying premeditation as a state of mind but describing it as "relating to a person's reasons and motives for acting as he or she did," not as part of the state of mind requirement); see also *State v. Scott*, 271 Kan. 103, 108-09, 21 P.3d 516 (2001) (rejecting a defendant's argument that the State failed to prove premeditation because he did not have time to think about killing the victim prior to doing so, as "[p]remeditation is the time of reflection or deliberation").

As the discussions in these cases indicate, premeditation cannot be separated from an intent to kill—premeditation involves forming the intent beforehand. Conceptually, these cases are consistent with the current mental disease or defect defense statute that requires the defendant lack the culpable mental state for the crime charged. The instructions informed the jury that McLinn had to (1) intend to kill Sasko and (2) premeditate the killing, meaning forming the intent to kill before the act. These instructions make it clear that McLinn had to form intent at both temporal points—before the killing and at the time of the killing. See K.S.A. 2013 Supp. 21-5209; K.S.A. 2013 Supp. 21-5202.

Justice Beier, in dissent, creates a scenario that would blur this distinction. She argues K.S.A. 2013 Supp. 21-5202(a) allows for culpable mental states other than the three statutorily listed mental states of intentionally, knowingly, and recklessly. She

concludes this possibility exists because 21-5202(a) includes the word "may." The "may," however, relates to the possibility of proof—"a culpable mental state *may* be established by proof" of one of the three culpable mental states. In context, use of the word "may" does not allow for reading the statute as allowing intentionally, knowingly, recklessly *plus* other mental states. This interpretation becomes more apparent through an examination of other provisions of 21-5202. For example, subsection (b) classifies the three listed culpable mental states "according to relative degrees, from highest to lowest." In doing so, it makes no provision for other possibilities. Then, subsection (c) explains a consequence of that ranking: "Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged." Application of that rule would not work with premeditation in the mix regardless of how a court ranked the culpability of "premeditation" as compared to "intentionally." As we have discussed, the State must prove premeditation *and* an intent to kill at the time the murder is committed. Proving premeditation does not substitute for proving intent at the time of the murderous act, and proving intent at the time of the act does not substitute for premeditation. K.S.A. 2013 Supp. 21-5202 makes no allowance for premeditation as a culpable mental state. And, as discussed, under K.S.A. 2013 Supp. 21-5209 "[i]t shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the *culpable* mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." (Emphasis added.)

McLinn has not established an error in the challenged jury instruction.

GUILT PHASE ISSUE 2: *The District Court Did Not Clearly Err In Failing to Sua Sponte Instruct the Jury on Second-Degree Intentional Murder.*

McLinn also contends the district court erred in not instructing the jury on the lesser included offense of second-degree intentional murder, although she acknowledges

she did not request this instruction. As with the previous issue, McLinn primarily argues that premeditation requires rational reflection on the act of killing, which, according to Dr. Hutchinson's testimony, McLinn could not accomplish. She argues that if the jury accepted portions of Dr. Hutchinson's testimony it likely would have found McLinn incapable of forming the rational thought necessary for premeditation—and, by extension, it would likely have convicted her of second-degree intentional murder had it been so instructed. But by not providing the lesser included offense instruction, the jury was deprived of this option. In support of this argument, McLinn urges this court to note a particular aspect of the State's expert's testimony: Dr. Logan dismissed McLinn's mental disease or defect defense because her personality states could form intent, but he "seems not to have considered the possibility" that McLinn's mental state prevented her from achieving a rational state of mind so as to premeditate the murder.

The State responds that even if a second-degree intentional murder instruction was legally appropriate, it was not factually appropriate in McLinn's case because "the evidence overwhelmingly demonstrated that she acted with premeditation." The State asserts that Dr. Hutchinson's testimony does not demonstrate McLinn's inability to premeditate her actions. Instead, Dr. Hutchinson testified McLinn lacked the ability to form any intent because she did not have the capability for such rational thought—which, in the State's view, "actually cuts against [the] factual appropriateness of any intentional offense instruction." Further, the State argues that if error occurred it must be deemed harmless, as even Dr. Hutchinson "acknowledged the meticulous planning and forethought involved in Sasko's death."

We apply the same rubric to our analysis of this jury instruction issue as we did in the prior issue. See *Williams*, 295 Kan. at 610.

21

*Legal Appropriateness*

In considering whether a second-degree intentional murder instruction would have been legally appropriate we begin by recognizing that "second-degree intentional murder is a lesser included offense of premeditated first-degree murder." *Knox*, 301 Kan. at 680; see *State v. Haberlein*, 296 Kan. 195, 204, 290 P.3d 640 (2012) ("The instruction . . . would have been legally appropriate here, because second-degree intentional murder is a lesser included offense of first-degree premeditated murder."). Hence, as the parties agree, the instruction was legally appropriate in McLinn's case.

*Factual Appropriateness*

The parties disagree, however, about whether a second-degree intentional murder instruction would have been factually appropriate.

The standard for when a lesser included offense instruction should be given is stated in K.S.A. 2013 Supp. 22-3414. If there is "some evidence which would reasonably justify a conviction of some lesser included crime," the district court "shall instruct the jury as to the crime charged and any such lesser included crime." K.S.A. 2013 Supp. 22-3414. We have advised district courts to approach the determination of whether a lesser included offense is factually supported as if the court was conducting a sufficiency review using the following test: Is there some evidence when viewed in the light most favorable to the defendant that would allow a rational factfinder to find the defendant guilty of the lesser included offense? *Plummer*, 295 Kan. at 161-62; *Seba*, 305 Kan. at 204 (asking whether "there is some evidence, [viewed in a light most favorable to the defendant,] emanating from whatever source and proffered by whichever party, that

22

would reasonably justify a conviction of some lesser included crime"). If so, the lesser included offense instruction should be given.

As for the specific charge in this case, "[w]hile both second-degree intentional murder and first-degree premeditated murder are intentional crimes, first-degree murder has the additional element of premeditation." *Knox*, 301 Kan. at 681. Undoubtedly, the record in this case is filled with considerable evidence of premeditation; McLinn herself outlined the planning and preparation she performed before killing Sasko. But that does not mean sufficient evidence does not also support a second-degree intentional instruction. As this court stated in similar circumstances:

> "While the evidence of premeditation in this case was extremely strong, there also was at least some evidence of each of the other elements of first-degree premeditated murder, and these elements are identical to the elements of second-degree intentional murder. Thus, at least in theory, the jury could have chosen to convict [the defendant] of second-degree intentional murder without having its verdict subject to reversal for insufficient evidence. This means the instruction was factually supported." *Haberlein*, 296 Kan. at 204.

Likewise, we conclude the instruction was factually appropriate in this case. Had the jury chosen to focus on some aspects of Dr. Hutchinson's testimony—i.e., received the testimony in the light most favorable to McLinn—the evidence was sufficient to allow a reasonable juror to find McLinn guilty of second-degree intentional murder. The district court should have issued the lesser included offense instruction.

*Not Clearly Erroneous*

Our determination that the omission of this instruction was erroneous does not answer the question of whether the failure to give the unrequested instruction was *clearly*

23

erroneous, which is our standard for reversibility of unpreserved jury instruction arguments. McLinn bears the burden of firmly convincing us that the jury would have convicted her of second-degree intentional murder rather than first-degree premeditated murder had the instructional error not occurred. *Knox*, 301 Kan. at 680. McLinn fails to meet this burden.

Generally, we consider several factors when examining evidence indicating premeditation, including: "'"(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless."'" *Knox*, 301 Kan. at 681 (quoting *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 [2014]).

Applying those factors in this case demonstrates strong evidence of premeditation. McLinn used a hunting knife to an area of the neck that she had determined through research was particularly vulnerable to serious injury and death. Prior to killing Sasko, McLinn practiced by killing animals, made up a dead relative in order to miss work for a few days without raising suspicions, and made other preparations such as gathering the tools (knife, zip ties, and drugs) used in the crime and researching ways to avoid detection while fleeing. The crime itself took a significant amount of time, as she drugged Sasko, tied him up, and then briefly unbound him before using a knife to kill him. Even though Sasko passed out, McLinn used fatal force and did so with apparent deliberation, virtually decapitating Sasko. Afterwards, she fled Kansas with firearms and survival gear and left behind electronic devices that might track her movement. In addition to this circumstantial evidence, McLinn told police officers (and Dr. Hutchinson) that she killed Sasko because she wanted to see how it felt, that she settled on Sasko five days before the murder, and that she had made preparatory plans.

24

There is thus ample evidence of premeditation, but McLinn argues her mental disease or defect defense complicates the issue. Once again, she separates the mental culpability inquiry into two parts, where the jury must first consider whether she lacked the ability to "intend to kill" and then whether she lacked the ability to truly "premeditate." We have already discussed the legal limitations of this argument.

In addition, McLinn's arguments face the same factual problems encountered in the case on which she relies. *White I*, 279 Kan. 326.

In that case, Bobby Bruce White testified he did not plan to kill the victim and did not remember driving to the location of the murder. A psychologist acknowledged that driving for two hours to kill the victim without really "knowing" it appeared improbable, but she believed the defendant's account and concluded the defendant's mental state prevented him from competently and rationally weighing his choices and his emotions strongly overpowered his rational thought—though she would not explicitly testify that the defendant's mental disease or defect prevented him from "'forming premeditation or the necessary intent.'" The psychologist in *White I* thus did not attempt to parse whether the defendant could intend to kill and yet could be incapable of premeditating the killing.

Neither did the psychologist in McLinn's case. Dr. Hutchinson testified McLinn could not form intent for premeditation "because forming an *intent* is a rational thought and [McLinn] did not have the capability of a rational thought because she didn't, at the time of that, have access to all the parts of her that would go into making a rational choice like it works for the rest of us." (Emphasis added.) Dr. Hutchinson's testimony was thus that McLinn could not form the intent to kill at all, not that McLinn could form intent to kill but could not form intent to premeditate. This understanding is further underscored by Dr. Hutchinson's (incorrect) recitation that premeditation "has, by definition, malice and aforethought, and without respect for life," and her implied

conclusion that Alyssa did not premeditatedly kill Sasko because she did so only to "save the life of the System."

In other words, had the jury accepted all aspects of Dr. Hutchinson's account of McLinn's psyche it would not have convicted McLinn of first-degree *or* second-degree murder and should instead have found her not culpable by reason of mental disease or defect. Indeed, as pointed out by the State, in this respect, Dr. Hutchinson's testimony and opinion were inconsistent with second-degree intentional murder.

McLinn also relies on *Jones*, 279 Kan. 395, to argue that "prolonged intentional conduct does not inherently equate with premeditation." This argument finds some support in *Jones*, which concluded that death by strangulation did not necessarily require a finding that the murder was premeditated because death could be accomplished "simply with intent, however prolonged."

Nevertheless, *Jones*' conclusion does not help McLinn because there is overwhelming and uncontested evidence that she planned to kill Sasko long before she did so. Assuming McLinn could form intent at all, the evidence overwhelmingly indicates she formed that intent well in advance of the murder. And we know the jury rejected Dr. Hutchinson's opinion about McLinn's alleged inability to form intent. Thus, McLinn has not convinced us the jury would have convicted her of second-degree murder.

In summary, McLinn has not demonstrated "a real possibility" a jury would have convicted her of second-degree intentional murder "had it been given that option." *Haberlein*, 296 Kan. at 206. Accordingly, the district court's failure to sua sponte issue an instruction on second-degree intentional murder was not clearly erroneous and a new trial should not be granted on these grounds.

26

GUILT PHASE ISSUE 3: *The District Court Did Not Err in Instructing the Jury That It Should Not Consider the Disposition of This Case in Arriving at Its Verdict.*

Although McLinn did not object at trial, she now argues the district court erred in giving Instruction 5, which informed the jury that its "only concern, at this time, is determining if the defendant is guilty or not guilty. The disposition of this case is not to be considered in arriving at your verdict." McLinn argues this instruction improperly nullified Instruction 14, which she contends properly informed the jury by stating that if it found McLinn

> "not guilty solely because [she], at the time of the alleged crime, was suffering from a mental disease or defect which rendered [her] incapable of possessing the required culpable mental state, then [she would be] committed to the State Security Hospital for safekeeping and treatment until discharged according to law."

Although Instruction 5 replicates a pattern instruction, McLinn argues the district court erred by not modifying it. See *State v. Moncla*, 262 Kan. 58, Syl. ¶ 5, 936 P.2d 727 (1997) ("If the particular facts in a given case require modification of the applicable pattern instruction, or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition."). McLinn suggests that *State v. Alexander*, 240 Kan. 273, 729 P.2d 1126 (1986), supports her position that Instruction 5 nullified Instruction 14 and, therefore, Instruction 5 should have been modified. We do not agree *Alexander* necessarily leads to that conclusion, however.

The district court in *Alexander* had instructed the jury on the insanity defense—a precursor to the current mental disease and defect defense. The *Alexander* defendant raised the opposite argument McLinn is raising now: He argued "the trial court erred in *failing* to advise the jury that the disposition of the case is a matter of concern only for the court and not the jury." (Emphasis added.) 240 Kan. at 286. The district court in

27

*Alexander* concluded it would be contradictory to tell the jury that a person found not guilty because of insanity would be committed to the State Security Hospital and then later to also instruct the jury that it should not consider the disposition of the case beyond a determination of guilt and innocence. Thus, the district court omitted from the instructions the phrase telling the jury not to consider the disposition of the case—the same position McLinn urges us to adopt. And indeed, on appeal in *Alexander*, this court concluded the district court's omission was not error. 240 Kan. at 286.

Hence, had the district court made the modification McLinn now supports, we could conclude no error occurred in light of our ruling in *Alexander*. But that does not necessarily answer whether it was error to give both instructions. In fact, language used by the *Alexander* court indicates the district court in this case did not err.

The *Alexander* court noted that when presented with an insanity defense "'the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity.'" Two of those outcomes were in the realm of common knowledge—but "a verdict of not guilty by reason of insanity has no such commonly understood meaning," as it "means neither freedom nor punishment" but rather commitment for an unspecified amount of time. 240 Kan. at 286 (quoting *Lyles v. United States*, 254 F.2d 725, 728 [D.C. 1957]). The purpose of the pattern instruction about the State Security Hospital, this court explained, was to fill this gap in the common knowledge and "inform the jury what will happen if they determine the defendant is not guilty by reason of insanity. Its purpose is not to force the jury into considering disposition, but to educate them regarding the insanity defense." 240 Kan. at 287.

This court's discussion in *Alexander* drew a line between educating the jury about the third verdict option and "forc[ing] the jury into considering disposition." 240 Kan. at 287. And it stopped short of saying a district court would err by giving the entirety of

28

both PIK instructions. Hence, to adopt McLinn's position we would have to extend *Alexander* to find error. But two reasons convince us such an extension would be inappropriate.

First, McLinn does not take issue with the first part of Instruction 5, informing the jury that its "only" concern was determining whether she was guilty or not guilty. This portion of the instruction already turns the jury away from considering the disposition of the case and sets the guilt-or-innocence threshold inquiry apart from Instruction 14, which instructs the jury about what would happen *if* it found McLinn not guilty and *if* it found her not guilty solely because of her mental disease or defect defense.

Second, like one of the instructions in *Alexander*, Instruction 14 does not permit the jury to consider whether McLinn needs treatment in arriving at the guilt determination. Instead, it only serves "to inform the jury what will happen if they determine the defendant is not guilty" by reason of mental disease or defect. And, as this court expressed in *Alexander*, this informational instruction is needed because this third possible verdict is not as commonly understood as "guilty" or "not guilty" and the jury deserves to know just as much about it. *Alexander*, 240 Kan. at 287.

In conclusion, the district court in this case did not have to modify the pattern instructions because the use of the full pattern instruction language—i.e., the "disposition of the case thereafter is not to be considered in arriving at your verdict"—merely emphasizes that the jury's duty is to determine guilt or innocence and it does not detract from the informational instruction that informs the jurors what will happen if they determine McLinn is not guilty by reason of mental disease or defect. See 240 Kan. at 287 (noting that failing to give this portion of the instruction did not allow the jury to improperly consider disposition, since it was still instructed its "only duty was to determine guilt or innocence"); see also *Moncla*, 262 Kan. 58, Syl. ¶ 5. Instructions 5 and

29

properly informed the jury about what a less familiar verdict would mean while still making it clear that its only concern was whether McLinn was guilty or not guilty.

Accordingly, we find no error in these jury instructions.

GUILT PHASE ISSUE 4: *The District Court Did Not Err in Restricting Defense Counsel's Remarks in Closing Argument.*

McLinn further contends the district court erred by refusing to allow her to assert, in closing arguments, that she would be "fine" with trying her case again should there be a hung jury. She explains she attempted to make this claim in order to dispel the notion, created by the court's statements prior to opening arguments, that a mistrial would burden both parties.

*Additional Facts*

The district court instructed the jury, prior to opening statements, about the rules each juror must follow. The court stated:

> "Any juror who violates these restrictions I have explained to you jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, the Court and the taxpayers."

In closing arguments, McLinn's counsel stated:

> "But I will tell you, folks, if you have a reasonable doubt about the claims made by the State, then you have to vote not guilty by reason of mental disease or defect. And if you have that thought process and you can't be dissuaded from that, then hang on to that verdict. Don't be pig-headed and don't be bull-headed. Think about it. Talk to them. Okay, this is

30

what I think and this is what the experts say, and this is what the evidence shows. Gosh, I am open. Work with me here. But if you have that verdict, hold on to that verdict. It's going to take twelve of you. If six of you go one way and six another, then we are going to have to try this case again, and that is fine."

The State objected and the district court stated, "That is improper argument." It then instructed the jury, "You are not to consider whether we would have to try this case again. It's irrelevant. And as long as I have interrupted [defense counsel,] I will correct another statement. You are not to consider what happens next."

*Standard of Review*

"The scope of oral argument generally lies within the sound discretion of the trial court, and the court's rulings will form no basis for a reversal absent a showing of abuse of discretion." *State v. Francis*, 282 Kan. 120, 143, 145 P.3d 48 (2006). A district court abuses its discretion if its decision

> "(1) is arbitrary, fanciful, or unreasonable, *i.e.,* if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.,* if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.,* if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

*Analysis*

In applying this standard of review, we begin with McLinn's suggestion that the district court's initial instructions, prior to opening argument, were incorrect. McLinn primarily relies on *State v. Salts*, 288 Kan. 263, 200 P.3d 464 (2009), in which a district

31

court informed the jury, via an instruction given just before the jury began its deliberations, that another trial would be a burden on both sides. The district court in *Salts* also informed the jury that the burden of another trial and the importance of arriving at a decision "does not mean that those favoring any particular position should surrender their honest convictions," but it "[does] mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion." 288 Kan. at 265.

The *Salts* defendant argued this instruction was a so-called *Allen* instruction, which this court had repeatedly disapproved, because it encouraged the jury to reach a unanimous verdict so as to avoid a mistrial. See *Tahah*, 302 Kan. 783 (discussing past cases dealing with *Allen* instruction issues); see also *Allen v. United States*, 164 U.S. 492, 501-02, 17 S. Ct. 154, 41 L. Ed. 528 (1896). The *Salts* defendant also argued the instruction was misleading and inaccurate because, far from being a burden, another trial was in fact "the State's obligation and [his] right." Finally, the defendant contended the instruction was also legally incorrect because "a jury should not consider what happens after trial." *Salts*, 288 Kan. at 265. We agreed with the *Salts* defendant and held that "including the language '[a]nother trial would be a burden on both sides' in [the jury instructions] is error." 288 Kan. at 266.

This case does not present the *Salts* scenario, however. Here, the instruction was not aimed at encouraging the jurors to reach a unanimous verdict. Rather, the district court instructed the jurors, prior to opening statements, that they should conform to the rules of the court and that a juror who violates those restrictions "jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over." The court also cautioned the jurors that a mistrial based on a juror's failure

32

to follow court rules would be "a tremendous expense and inconvenience to the parties." These instructions are exactly like those at issue in *Tahah*, 302 Kan. 783.

In *Tahah*, we ruled that information aimed at preventing juror misconduct when given to a newly impaneled jury did not involve the same dangers as in *Salts*. *Tahah*, 302 Kan. at 792, 794. We reaffirmed that a *Salts*-like instruction should not be given because it "risks coercing a unanimous verdict by unduly influencing jurors to compromise their views on the evidence simply to avoid a hung jury." Further, "[b]ecause of its coercive character, the *Allen* instruction has rightly been described as factually inaccurate. A new trial due to a hung jury is likely not, in fact, an inconvenience to the defendant—especially when measured against a coerced conviction. But a preliminary instruction's "character and purpose are entirely different," as it "occurred at the start of trial, before the presentation of evidence, and warned jurors of the dangers of a mistrial resulting from their own misconduct." The preliminary instruction's coercive effect, which was to prevent juror misconduct, was "entirely proper and justified." 302 Kan. at 794-95.

We thus conclude the preliminary instruction in McLinn's case was properly issued and did not need "correcting" in closing arguments.

With that context in mind, we now turn to defense counsel's statements in closing arguments. Here, we cannot determine the district court abused its discretion in restricting defense counsel from arguing McLinn was "fine" with a retrial because we conclude other reasonable people would take the view adopted by the district court. See *Ward*, 292 Kan. at 550. Jurors could have interpreted defense counsel's statement that McLinn would be "fine" with a hung jury as urging them to violate their oaths to return a verdict based solely on the evidence and to instead consider the consequences of a divided verdict. The district court did not abuse its discretion in concluding counsel went too far.

33

Nor did the district court's statement that defense counsel's argument was improper constitute an error of law: The district court merely reiterated its previous instruction that the jury's only concern was whether McLinn was guilty or not guilty and it was not to consider what happened next. This contrasts with *Salts*—here, the court said nothing that would have left the jury with the improper impression that McLinn would be inconvenienced by a hung jury.

Accordingly, we hold McLinn has not demonstrated the district court abused its discretion regarding the scope of closing arguments.

GUILT PHASE ISSUE 5: *McLinn's Guilt-Phase Cumulative Error Argument Fails.*

"Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Waller*, 299 Kan. 707, 727-28, 328 P.3d 1111 (2014); see *State v. Roeder*, 300 Kan. 901, 939, 336 P.3d 831 (2014) (setting out a de novo standard of review). However, we will not find cumulative error "when the record fails to support the errors raised on appeal." *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). A single error will not constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

We have found only one error: the failure to instruct the jury on the lesser included offense of second-degree intentional murder. Therefore, there is no error to accumulate and no basis for affording McLinn relief on that ground.

*Conclusion Regarding Guilt Phase Issues*

We affirm McLinn's first-degree premeditated murder conviction.

34

ANALYSIS OF PENALTY PHASE ISSUES

McLinn raises five penalty phase issues relating to the jury's determination she had murdered Sasko in an especially heinous, atrocious, or cruel manner and to her sentence of life without the possibility of parole for 50 years, followed by lifetime postrelease supervision. Only one of these issues has merit: The district court erred in imposing lifetime postrelease supervision rather than parole. Otherwise, we reject McLinn's claims that insufficient evidence supported a finding she committed an especially heinous, atrocious, or cruel murder; that the court erred in its jury instructions; that K.S.A. 2013 Supp. 21-6624(f) is unconstitutionally vague; and that the court abused its discretion in refusing to impose a hard 25 life sentence.

PENALTY PHASE ISSUE 1: *Sufficient Evidence Supports the Jury's Conclusion That McLinn's Crime Was Especially Heinous, Atrocious, or Cruel.*

Once the jury had returned a verdict finding McLinn guilty of first-degree premeditated murder, the proceedings turned to sentencing. The district court instructed the jury that "Kansas law provides that a separate proceeding shall . . . be conducted to determine whether the defendant shall serve a mandatory minimum 50 year term of imprisonment." The district court then asked the jury to determine, beyond a reasonable doubt, whether one or more aggravating circumstances alleged by the State existed—specifically, whether "[t]he defendant committed the crime in an especially heinous, atrocious or cruel manner." The jury found the murder had been especially heinous, atrocious, or cruel, and the district court sentenced McLinn to a hard 50 life sentence after denying her motion to impose a hard 25 life sentence.

Now, on appeal, McLinn contends that trial evidence showed Sasko's death was swift and unaccompanied by mental anguish—Sasko was sedated, was never in fear of his life, and suffered as painless a death as possible. Given those circumstances, McLinn asks us to conclude her conduct cannot be characterized as especially heinous, atrocious, or cruel. She contends this requires us to vacate her hard 50 sentence.

*Standard of Review*

When reviewing a claim that insufficient evidence supports a jury's determination that a murder was especially heinous, atrocious, or cruel, our standard of review is whether, viewing the evidence in the light most favorable to the prosecution, "a rational factfinder could have found beyond a reasonable doubt" that the aggravating factor existed. *State v. Astorga*, 299 Kan. 395, 402, 403, 324 P.3d 1046 (2014); see *State v. Soto*, 299 Kan. 102, 114-15, 322 P.3d 334 (2014).

Some of McLinn's arguments require us to consider the wording of K.S.A. 2013 Supp. 21-6624(f), which defines the phrase "especially heinous, atrocious, or cruel." We review such issues of statutory interpretation de novo. *State v. Charles*, 298 Kan. 993, 997, 318 P.3d 997 (2014).

*Analysis*

Kansas law requires a life sentence for first-degree premeditated murder and provides for a separate, penalty-phase jury proceeding to determine whether a defendant's case presents aggravating factors that may serve as a basis for an enhanced minimum sentence. One such aggravating factor provides for an enhanced punishment if the murder is *especially* heinous, atrocious, or cruel. K.S.A. 2013 Supp. 21-6624(f).

36

When the Legislature first enacted the enhanced minimum penalty statute, it did not define "heinous, atrocious, or cruel" or provide examples of such conduct. Without any statutory explanation for these words, this court construed the legislative intent to require a showing that a victim suffered from serious physical abuse or serious mental anguish prior to death. See, e.g., *State v. Kleypas*, 282 Kan. 560, 566, 147 P.3d 1058 (2006); *State v. Spry*, 266 Kan. 523, 531-32, 973 P.3d 783 (1999); *State v. Cook*, 259 Kan. 370, 397-98, 913 P.2d 97 (1996). McLinn cites to cases applying this construction to argue Sasko's death was swift and unaccompanied by mental anguish and, "for a killing involving a deadly weapon," as "painless as possible."

But "the fundamental rule for sentencing is that the person convicted of a crime is sentenced in accordance with the sentencing provisions in effect at the time the crime was committed." *State v. Overton*, 279 Kan. 547, 561, 112 P.3d 244 (2005). And by the time of McLinn's crime the Legislature had added language making clear that

"finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel." K.S.A. 2013 Supp. 21-6624(f).

In addition, by the time of the murder, K.S.A. 2013 Supp. 21-6624(f) provided examples of heinous, atrocious, or cruel conduct, stating in relevant part:

"(1)    Prior stalking of or criminal threats to the victim;
"(2)    preparation or planning, indicating an intention that the killing was meant to be
         especially heinous, atrocious or cruel;
"(3)    infliction of mental anguish or physical abuse before the victim's death;
"(4)     torture of the victim;
"(5)    continuous acts of violence begun before or continuing after the killing;

37

"(6)     desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

"(7)     any other conduct the trier of fact expressly finds is especially heinous."

Under these provisions, Sasko's consciousness is simply not determinative of the jury's inquiry into whether an aggravating factor existed. McLinn's reliance on older cases applying an older statute does not speak to the true issue here.

McLinn next argues that neither the evidence nor the law supports the State's arguments that McLinn's crime was especially heinous, atrocious, or cruel. She categorizes the State's arguments to the jury regarding reasons McLinn's murder of Sasko could be especially heinous, atrocious, or cruel as: (1) Sasko was helpless when murdered; (2) he suffered a severe neck wound; (3) McLinn wrote "Freedom" on the wall with Sasko's blood; and (4) she committed the murder to "satisfy curiosity." We disagree with McLinn's description of some of the State's arguments.

Regarding Sasko's helplessness, the State certainly discussed this point during the penalty phase. But it did not argue Sasko's helplessness, by itself, made the murder especially heinous, atrocious, and cruel in the same way as was argued in *State v. Baker*, 281 Kan. 997, 135 P.3d 1098 (2006), the case on which McLinn relies. Nor did the State make an argument that depended, as McLinn would suggest, on K.S.A. 2013 Supp. 21-6624(f)(3) (infliction of mental anguish). Instead, the State discussed how McLinn took deliberate steps to render Sasko helpless. These steps illustrate one of the listed descriptions of heinous, atrocious, or cruel actions—"preparation or planning[] indicating an intention that the killing was meant to be especially heinous, atrocious or cruel." K.S.A. 2013 Supp. 21-6624(f)(2).

38

Similarly, contrary to McLinn's argument, the State did not suggest that the aggravating factor was present simply "because Ms. McLinn inflicted a severe neck wound upon Mr. Sasko." Rather, the State argued McLinn chose her weapon because she wanted to kill Sasko in a particular and methodical way to "maximize" the experience of killing. This ties closely with the evidence about McLinn acting out of curiosity. Again, these arguments illustrate that McLinn's preparation and planning indicated "an intention that the killing was meant to be especially heinous, atrocious or cruel." K.S.A. 2013 Supp. 21-6624(f)(2). In addition, the nature of the wound—a deep wound that nearly severed all tissue—and the mechanism—a sawing action—provided evidence of "continuous acts of violence begun before or continuing after the killing." K.S.A. 2013 Supp. 21-6624(f)(5).

As to the last point made by McLinn, that writing on the wall with blood does not make a killing especially heinous, atrocious, or cruel, we will assume without deciding that this one circumstance would not be enough to sustain the State's burden during the penalty phase. But we cannot view this circumstance in isolation, as to do so would create a skewed view of the evidence and would be symptomatic of the real difficulty with McLinn's arguments: She does not engage with the evidence that supported the jury's conclusion regarding an aggravating factor.

Viewing the evidence in the light most favorable to the State, a rational jury could conclude McLinn planned to kill Sasko and practiced on animals, researched body vulnerability points, and executed a carefully planned escape afterwards. She drugged Sasko and bound him—and there is evidence Sasko moaned during this procedure—and then essentially slit Sasko's throat in a gruesome fashion described at length by a forensic pathologist and by McLinn herself. Afterwards, she calmly related what had happened to the police and explained she simply wanted to know what killing felt like. All these circumstances are absent from *Baker*, 281 Kan. 997, a case cited by McLinn in which we

39

rejected the sufficiency of the evidence supporting the jury's finding of an especially heinous, atrocious, or cruel murder.

The above behavior, which is only a small sample of a great deal of corresponding evidence indicating McLinn methodically orchestrated Sasko's death, shows "preparation or planning," raises at least a possibility of mental anguish, and, judging from the crime scene photographs and the murder weapon, shows a particularly disturbing method of murder that in and of itself could be viewed as especially egregious. See K.S.A. Supp. 21-6624(f); cf. *Cook*, 259 Kan. at 401 (noting the "general rule in Kansas" that shooting deaths do not support a finding of a heinous, atrocious, or cruel death).

Viewing the evidence in the light most favorable to the State, the jury's decision is supported by sufficient evidence.

PENALTY PHASE ISSUE 2: *The District Court Did Not Commit Reversible Error in Declining to Further Define "Heinous," "Atrocious," and "Cruel."*

McLinn asserts the district court erred by declining the jury's request to provide definitions for heinous, atrocious, and cruel.

*Additional Facts*

During the penalty phase, the district court asked the jury to consider whether one or more aggravating circumstances alleged by the State existed. Neither party raised objections to the district court's proposed penalty phase instructions.

The relevant instruction stated that the State contended one aggravating factor existed: "The defendant committed the crime in an especially heinous, atrocious or cruel manner." The instruction further provided:

"A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel."

During deliberations, the jury sent a note reading, "We would like you to please provide the legal definitions of heinous, atrocious, and cruel."

The district court proposed responding, "Words are to be given their common meaning." Defense counsel produced K.S.A. 2013 Supp. 21-6624 and read that an explanatory note suggested especially heinous, atrocious, or cruel behavior "[m]eans pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others"—although the note pertained to a hard 40 case under an older version of the statute. The district court responded that an older statute would not be much help, at which point defense counsel asked the district court to say, "'[H]einous means extremely wicked or shockingly evil.'" The district court determined it would not define the terms. Over McLinn's objection, the district court then instructed the jury that words were to be given their ordinary meaning.

*Standard of Review and Applicable Law*

A district court has a ""mandatory duty to respond to a jury's request for further information as to the law of the case,"" although ""[t]he manner and extent of the trial court's response rest in the sound discretion of the trial court."" *Francis*, 282 Kan. at 147

41

(quoting *State v. Sperry*, 267 Kan. 287, 311, 978 P.2d 933 [1999]); see also K.S.A. 22-3420; *State v. Bandt*, 219 Kan. 816, 824, 549 P.2d 936 (1976) ("A trial court is vested with a great amount of discretion in answering questions directed to him by a jury after the jury has began its deliberations.").

"In deciding whether error occurred, a district court's response to a mid-deliberation jury question is reviewed for abuse of discretion." *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014). In making this determination, we apply an unlimited standard of review to the determination of whether the district court's response was a correct statement of the law—a legal question. "'But when looking at which legally appropriate response the court should have made, [this court] accord[s] the trial court the deference of looking to whether no reasonable person would have given the response adopted by the trial court.'" 299 Kan. at 856 (quoting *State v. Wade*, 295 Kan. 916, 921, 287 P.3d 237 [2012]).

McLinn requested the district court provide further clarification, and, assuming she carries her burden to demonstrate an error occurred, such error is reversible unless we determine the error was harmless. *Knox*, 301 Kan. at 677; see *State v. Smith-Parker*, 301 Kan. 132, 161, 340 P.3d 485 (2014) ("The burden of demonstrating error is on the party alleging the abuse.").

"While the district court has a duty to instruct the jury on the law that applies in a particular case, a district court does not have to provide the jury a definition for widely used words or those readily comprehensible by individuals of common intelligence." *Bolze-Sann*, 302 Kan. at 210. Jurors are "expected to decipher many difficult phrases without receiving specific definitions," *State v. Robinson*, 261 Kan. 865, 877, 934 P.2d 38 (1997), and "[a] district court should only define additional terms if the instructions as

42

a whole would otherwise mislead the jury or cause it to speculate," *Bolze-Sann*, 302 Kan. at 210.

*Analysis*

Because McLinn argues the district court abused its discretion in responding to a mid-deliberation jury question, she must do more than show her requested clarification would have been appropriate—she must show that the district court's response was an incorrect statement of the law or, if the district court's response was legally appropriate, that "no reasonable person would have given the response." See *Wade*, 295 Kan. at 921. We conclude McLinn cannot make this showing.

McLinn's argument at first seems persuasive, as the full, current pattern instruction for aggravating circumstances defines heinous, atrocious, or cruel in the following ways:

> "'[H]einous' means extremely wicked or shockingly evil;
> "'atrocious' means outrageously wicked and vile; and
> "'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the sufferings of others." PIK Crim. 4th 54.113 (2015 Supp.).

In other words, PIK Crim. 4th 54.113 (2015 Supp.) substantially corresponds to McLinn's requested clarifications.

But the version of this instruction in use at the time of McLinn's trial did not provide any such definitions for heinous, atrocious, or cruel—in fact, no definitions were provided at all. See PIK Crim. 4th 54.113 (2013 Supp.). This explains why, at the time of trial, both the parties and the district court seem to have concluded the terms were not defined in the pattern instructions.

Thus, in resolving McLinn's proposed clarification, the district court did not have the full use of the current instruction. Instead, it had an explanatory note from an older version of the aggravating circumstances statute defining "cruel" as "pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others" and a case, falling under the older statute, suggesting "heinous means extremely wicked or shockingly evil." Although such clarifications would now certainly be supported in law, and might have been then, the district court's decision to not go beyond the pattern instructions by providing additional information was not legally improper.

Indeed, the words heinous, atrocious, and cruel are widely used and are readily comprehensible by individuals of common intelligence. See, e.g., Webster's New World College Dictionary 91, 356, 674 (5th ed. 2016) (defining "atrocious" as "very cruel, evil, brutal, etc."; "cruel" as, among other things, "enjoying others' suffering; without mercy or pity"; and "heinous" as "outrageously evil or wicked; abominable"). Furthermore, nothing suggests that the failure to define the terms misled the jury or caused it to speculate rather than apply a common understanding of the words. As such the district court was not required to define the terms. See *Bolze-Sann*, 302 Kan. at 210.

Again, the issue as argued by McLinn is not whether the district court would have erred in denying a definitional instruction had it been requested during the charging stage, but whether the district court's response to the jury's question constituted an abuse of discretion. Given that the PIK committee issued the 2013 version of the instructions without defining the terms, McLinn has not demonstrated that no reasonable person would have given such a response—indicating the response was in fact legally appropriate. *Lewis*, 299 Kan. at 856. The district court's response was not an incorrect statement of the law.

Finally, we note the authority cited by McLinn predates the legislative amendments moving away from the pain and suffering standard that had been adopted by this court. In essence, at that time, some definition was necessary in order to make the jury aware of the judicially created definition. See, e.g., *State v. Willis*, 254 Kan. 119, 128-29, 864 P.2d 1198 (1993). And in one of the cases on which McLinn relies, *State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992), this court referred to definitions remarkably similar to the common dictionary definitions we cited above and concluded the statute was not unconstitutionally vague. In doing so, the court observed: "It would be impossible to devise a laundry list of particular forms of killing that would encompass the intended subject. Thus, the statute has to rely on adjectives." 251 Kan. at 174. These cases do not compel a finding of error.

The district court did not abuse its discretion and did not err by relying on the jurors' expected ability to decipher difficult phrases and to make use of common intelligence. See *Robinson*, 261 Kan. at 877. Because we find no error, we need not engage in a reversibility inquiry.

PENALTY PHASE ISSUE 3: *K.S.A. 2013 Supp. 21-6624 Is Not Unconstitutionally Vague.*

McLinn next argues K.S.A. 2013 Supp. 21-6624(f) is unconstitutionally vague because it contains no standard for what constitutes especially heinous, atrocious, or cruel conduct.

A question of whether McLinn preserved this issue arises because, as McLinn acknowledges, she did not challenge the constitutionality of K.S.A. 2013 Supp. 21-6624(f) before the district court. Ordinarily this failure would discourage this court from exercising review over the issue. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). But exceptions exist to the general rule, and McLinn invokes one that

applies: "[C]onsideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) (quoting *State v. Spotts*, 288 Kan. 650, 652, 206 P.3d 510 [2009]).

*Standard of Review and Legal Principles*

We must presume a statute is constitutional: "'All doubts must be resolved in favor of its validity,'" and we will construe the statute as constitutionally valid if there is any reasonable way to do so. *State v. Adams*, 254 Kan. 436, 438, 866 P.2d 1017 (1994) (quoting *Moody v. Board of Shawnee County Comm'rs,* 237 Kan. 67, 74, 697 P.2d 1310 [1985]). Whether a statute is constitutional is a question of law subject to unlimited review. *Williams*, 299 Kan. at 919.

As we mentioned above, McLinn argues K.S.A. 2013 Supp. 21-6624(f) is unconstitutionally vague. "For penal statutes," like 21-6624(f), "the vagueness issue is a due process one concerned with whether, when measured by common understanding and practice, the law gives reasonable notice of what conduct is proscribed or how persons may conform their conduct to the requirements of law." *State v. Cordray*, 277 Kan. 43, 51, 82 P.3d 503 (2004). A statute is unconstitutionally vague and indefinite "unless its language conveys a sufficiently definite warning of the conduct proscribed when measured by common understanding and practice." *City of Wichita v. Wallace*, 246 Kan. 253, 258, 788 P.2d 270 (1990); see also *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977) (referring to issues of fundamental fairness).

*Analysis*

McLinn's primary contention is that while K.S.A. 2013 Supp. 21-6624 lists six specific examples of "[c]onduct which is heinous, atrocious or cruel," it does not list any

conduct conforming with the actual aggravating factor at issue here, which is that the defendant committed the crime "in an *especially* heinous, atrocious or cruel manner." (Emphasis added.) K.S.A. 2013 Supp. 21-6624(f).

We are not persuaded. We conclude that the explicit list of conduct, even if it only describes "merely" heinous, atrocious, or cruel behavior, still provides a standard—to be an aggravating circumstance the conduct must be *especially* heinous, atrocious, or cruel. See K.S.A. 2103 Supp. 21-6624. Even if we accept McLinn's theory of the statute, 21-6624(f) still provides a baseline list of conduct and then informs the reader that the listed conduct must be an "especial" example of the conduct in order to be "especially heinous, atrocious, or cruel." We reject McLinn's argument that K.S.A. 2013 Supp. 21-6624(f) is unconstitutionally vague.

As for McLinn's final argument on the subject, she contends that the seventh statutory example of conduct which is heinous, atrocious, or cruel—"any other conduct the trier of fact expressly finds is especially heinous"—renders the statute standardless. There is no evidence the jury knew of—much less resorted to—this seventh example of conduct in finding beyond a reasonable doubt that there was an aggravating circumstance in McLinn's case, nor is this seventh category the only category covered by her conduct. She nonetheless asserts that this seventh example renders the statute unconstitutionally vague.

We have previously held that "[a] defendant to whom a statute may constitutionally be applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally in circumstances not before the court." *State v. Papen*, 274 Kan. 149, 162, 50 P.3d 37 (2002). Under this precedent, McLinn must demonstrate the statute was unconstitutional as it applied to her, not that it could be unconstitutional as applied in some other case or under some other circumstances.

To sway us to depart from this standard, McLinn offers the United States Supreme Court's decision in *Johnson v. United States*, 576 U.S. ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). *Johnson*, however, considered almost the opposite issue—whether a statute that unconstitutionally applied to a defendant could be saved when it could conceivably be constitutional in other cases. 135 S. Ct. at 2561. *Johnson* does not suggest a defendant no longer needs to show the statute was unconstitutional in his or her own case first, and we do not depart from our holding in *Papen*.

McLinn cannot assert this vagueness challenge through circumstances not in her own case, see *Papen*, 274 Kan. at 162, and thus her second constitutional challenge to K.S.A. 2013 Supp. 21-6624 fails.

In summary, all of McLinn's arguments regarding the unconstitutionality of K.S.A. 2103 Supp. 21-6624 lack merit.

PENALTY PHASE ISSUE 4: *The District Court Did Not Abuse Its Discretion in Declining to Impose a Hard 25 Sentence.*

McLinn urges us to conclude that her case presented substantial and compelling reasons to depart from a hard 50 sentence, and that the district court's refusal to do so was unreasonable and in error.

*Additional Facts*

After the jury found McLinn committed the crime in an especially heinous, atrocious, or cruel manner, the district court ordered a third-party forensic evaluation. The two evaluators diagnosed McLinn with borderline personality disorder with

48

antisocial features, as well as post-traumatic stress disorder. They both recommended McLinn "receive routine legal disposition based upon her charges."

At the sentencing hearing, the State requested a hard 50 sentence and contended McLinn's crime was shockingly heinous, atrocious, or cruel. Defense counsel responded by agreeing that "no nice little girl would do this crime, and the nice little girl that I refer to is Sarah Gonzales McLinn." But reports indicated, defense counsel continued, that "there were things lurking inside her brain, with inside her soul, with inside her psychic [*sic*]." In defense counsel's view, it was Alyssa who committed the crime, "and Alyssa is a very bad person." Counsel urged the court to impose a 25-year sentence so McLinn could get all the help she needs and then a parole board could consider whether she was safe to reenter society. A 50-year sentence, however, "means no hope." Counsel mentioned several mitigating circumstances: She had no significant history of prior criminal behavior, McLinn was under the influence of extreme mental or emotional disturbances, and she was suffering from post-traumatic stress.

McLinn addressed the court and apologized to her family and to Sasko's family.

The district court recounted that the State's expert did not actually diagnose McLinn with DID but in any event stated this disorder did not prevent her from forming an intent to kill Sasko; a jury did not find McLinn suffered from mental illness to a degree it negated her intent; and two independent experts determined McLinn does not suffer from DID but rather borderline personality disorder with antisocial features. The district court concluded

"there [was] no evidence to support a commitment to a psychiatric facility in lieu of imprisonment . . . , nor is there evidence to support a finding of substantial and compelling reasons to depart from the statutory mandatory minimum sentence provided

in K.S.A. 2013 Supp. 21-6623 for a murder that was heinous, atrocious and cruel on so many levels."

Accordingly, the district court announced sentencing, ordering McLinn serve a prison sentence of life, without possibility of parole for 50 years, followed by lifetime postrelease supervision.

*Standard of Review*

We review the district court's decision not to depart from a presumptive sentence for abuse of discretion. Again, "'[a] district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based.'" *State v. Jolly*, 301 Kan. 313, 325, 342 P.3d 935 (2015) (quoting *Smith*, 299 Kan. at 970). "The burden of demonstrating error is on the party alleging the abuse." *Smith-Parker*, 301 Kan. at 161.

*Analysis*

After a jury returns a unanimous decision regarding the existence of an aggravating circumstance during the penalty phase proceedings, the defendant "shall be sentenced pursuant to K.S.A. 21-6623"—in McLinn's case, a hard 50 sentence—"unless the sentencing judge finds substantial and compelling reasons, following a review of mitigating circumstances," to impose a hard 25 sentence. K.S.A. 2013 Supp. 21-6620(b)(6). A nonexhaustive list of mitigating circumstances the sentencing judge may consider are set forth in K.S.A. 2013 Supp. 21-6625. See, e.g., K.S.A. 2013 Supp. 21-6625(a)(1) (considering whether the defendant has any significant history of prior criminal activity); 21-6625(a)(2) (defendant under the influence of extreme mental or

50

emotional disturbances); 21-6625(a)(5) (defendant under extreme distress or under the substantial domination of another person); 21-6625(a)(6) (defendant's capacity to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired); 21-6625(a)(7) (defendant's age); 21-6625(a)(8) (defendant suffering from post-traumatic stress syndrome caused by violence or abuse by the victim).

Here, McLinn argues the district court abused its discretion by not choosing to impose a hard 25 sentence after reviewing mitigating circumstances—in essence, that the district court abused its discretion in not concluding that substantial and compelling circumstances existed to depart from the presumptive sentence. See K.S.A. 2013 Supp. 21-6625. As McLinn points out, several statutory mitigating circumstances are arguably present in her case: She does not have a history of criminal activity, both parties' experts agreed McLinn suffered from mental health issues at the time of the killing, there were issues with the power balance between McLinn and Sasko, she suffered from post-traumatic stress of some sort, and she was relatively young. See K.S.A. 2013 Supp. 21-6625(a)(1), (2), (5), (6), (7), (8). But, as discussed at length in the preceding sections of this decision, McLinn's defense depended on the jury conclusion that she could not "intend" her actions, and the jury rejected this defense. Despite the jury's verdict, McLinn renewed arguments during sentencing that relied on a conclusion that one personality subset, Alyssa, was a bad person but Sarah McLinn was a good person—despite the third-party experts' conclusion that McLinn did not suffer from DID.

As determined by the jury's verdict, McLinn researched, planned, and executed a gruesome death. In the end, McLinn cannot demonstrate the district court abused its discretion in determining, due to a crime that was, in the district court's words, "heinous, atrocious and cruel on so many levels," that there was no compelling reason to depart from the presumptive sentence.

51

PENALTY PHASE ISSUE 5: *The Lifetime Postrelease Supervision Portion of McLinn's Sentence Must Be Vacated.*

"Whether a sentence is illegal is a question of law subject to de novo review." *State v. Collins*, 303 Kan. 472, 473, 362 P.3d 1098 (2015). As relevant to McLinn's situation, "illegal sentence[s]" include "a sentence that does not conform to the applicable statutory provision, either in character or the term of authorized punishment." *State v. Taylor*, 299 Kan. 5, 8, 319 P.3d 1256 (2014). "The court may correct an illegal sentence at any time," K.S.A. 22-3504(1), meaning an illegal sentence may be considered for the first time on appeal, as it is here. *State v. Dickey*, 301 Kan. 1018, 1027, 350 P.3d 1054 (2015).

Here, we agree with both parties that the district court should have imposed lifetime parole, pursuant to K.S.A. 2013 Supp. 21-6620(b)(6) and K.S.A. 2013 Supp. 21-6623. These statutes deal with parole after the mandatory sentence is over and do not authorize postrelease supervision. See also, e.g., *State v. Potts*, 304 Kan. 687, 708, 374 P.3d 639 (2016). Accordingly, we vacate the postrelease supervision portion of McLinn's sentence and remand for resentencing, with instructions that the district court impose lifetime parole.

CONCLUSION

McLinn's conviction for first-degree premeditated murder is affirmed, as is her hard 50 lifetime sentence. The postrelease portion of her sentence is vacated, and this case is remanded with instructions that the district court impose lifetime parole.

Affirmed in part, vacated in part, and remanded with directions to sentence the defendant to parole rather than postrelease supervision.

ROSEN, J., concurring:  I disagree with the majority opinion which finds error by concluding that the record demonstrates an obligation to instruct the jury on second-degree murder. This is not a situation where a defendant is being denied the opportunity to present his or her theory of the case that a less culpable mental state supports a lesser included offense; ample evidence was presented and the jury was appropriately instructed on McLinn's mental disease or defect defense.

K.S.A. 2013 Supp. 22-3414(3) provides "where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." I will not belabor the point; I would simply find on this record and, consistent with my dissenting/concurring opinions in *State v. Fisher*, 304 Kan. 242, 265, 373 P.3d 781 (2016); *State v. Qualls*, 297 Kan. 61, 73, 298 P.3d 311 (2013); *State v. Haberlein*, 296 Kan. 195, 290 P.3d 640 (2012); *State v. Tahah*, 293 Kan. 267, 262 P.3d 1045 (2011); and *State v. Scaife*, 286 Kan. 614, 186 P.3d 755 (2008), that the trial judge did not err when she did not instruct the jury on the lesser included offense of second-degree intentional murder.

Even viewing the evidence in the light most favorable to McLinn, I cannot agree that we are required to speculate as to whether the evidence in this case would reasonably justify a conviction of the lesser included crime. As the majority points out, there is "ample evidence of premeditation":

> "McLinn used a hunting knife to an area of the neck that she had determined through
> research was particularly vulnerable to serious injury and death. Prior to killing Sasko,

McLinn practiced by killing animals, made up a dead relative in order to miss work for a few days without raising suspicions, and made other preparations, such as gathering the tools (knife, zip ties, and drugs) used in the crime and researching ways to avoid detection while fleeing. The crime itself took a significant amount of time, as she drugged Sasko, tied him up, and then briefly unbound him before using a knife to kill him. Even though Sasko passed out, McLinn used fatal force and did so with apparent deliberation, virtually decapitating Sasko. Afterwards, she fled Kansas with firearms and survival gear and left behind electronic devices that might track her movement. In addition to this circumstantial evidence, McLinn told police officers (and Dr. Hutchinson) that she killed Sasko because she wanted to see how it felt, that she settled on Sasko five days before the murder, and that she had made preparatory plans." Slip op. at 24.

Such compelling evidence of premeditation is rarely proven in a first-degree murder case.

As I stated in my aforementioned dissents, the test set forth in K.S.A. 2013 Supp. 22-3414(3) is not a theoretical one. Instead, it requires the trial judge, who has heard and ruled on the evidence in the case, to determine whether there is "some evidence which would *reasonably justify a conviction*" of the lesser included crime. (Emphasis added.) By utilizing our sufficiency of the evidence standard as the lens in which we view whether the evidence reasonably justifies a conviction, almost any scenario limited only by one's imagination would suffice in making the determination on whether to instruct. In this case, by utilizing the rationale of the majority, the trial judge had no option but to instruct the jury on all lesser included offenses, regardless of whether they were requested and in spite of the actual evidence. Given the scope of Dr. Hutchinson's testimony, each of McLinn's personalities supplied some speculative evidence of either murder in the second degree (both intentional and unintentional), voluntary manslaughter, and involuntary manslaughter. By employing the majority's standard we are mandating that in this case—and nearly all cases where the facts support a charge of premeditated first-degree murder—the trial court is essentially required to instruct on most, if not all, lesser included offenses. As I have opined in my previous dissents on this issue, that has never

been the law and should not now become the law of this state. I would find that on this record and consistent with my prior dissenting opinions on this issue, the trial court did not err in not instructing the jury on intentional second-degree murder.

NUSS, C.J., and STEGALL, J., join the foregoing concurrence.

* * *

STEGALL, J., concurring: I join the majority opinion in all but two respects. First, I previously joined Justice Rosen's position with respect to lesser included instructions and K.S.A. 2013 Supp. 22-3414(3). See *State v. Fisher*, 304 Kan. 242, 265-66, 373 P.3d 781 (2016) (Rosen, J., concurring). I do so again today.

Second, while I disagree with Justice Johnson's characterization of *State v. Tahah*, and with his separate opinion in that case, see *Tahah*, 302 Kan. 783, 796, 358 P.3d 819 (2015) (Johnson, J., concurring), I generally agree with his assessment of the impact of *Tahah* on the closing argument issue in today's case. See slip op. at 56 (Johnson, J., concurring in part and dissenting in part). Here, defense counsel was essentially arguing, "[H]ang on to [the] verdict" you have reached by considering the evidence and don't worry about or consider the future impact of "hold[ing] on to that verdict." In reality, defense counsel's argument was entirely consistent with the district court's subsequent admonition to the jury to "not consider whether we would have to try this case again" and to "not consider what happens next."

I view this episode as a simple misunderstanding. The district court factually erred when it construed defense counsel's argument as urging jurors to consider "what happens next" when formulating their verdict. In fact, defense counsel was pleading quite the opposite. As such, I would find the district court made a factual error and thus abused its

55

discretion by restricting defense counsel's closing argument and holding it was "improper." Nevertheless, the error was harmless.

* * *

JOHNSON, J., concurring in part and dissenting in part: I concur with the majority, except for its assessment of the district court's restrictions on defense counsel's closing argument, as it discusses under the label, Guilt Phase Issue 4. As I have previously opined, I consider the initial instruction on mistrials to be factually inaccurate and legally erroneous. See *State v. Tahah*, 302 Kan. 783, 796-803, 358 P.3d 819 (2015) (Johnson, J., concurring), *cert. denied* 136 S. Ct. 1218 (2016); *State v. Fisher*, 304 Kan. 242, 268-69, 373 P.3d 781 (2016) (Johnson, J., dissenting). Moreover, in my view, this case highlights the incongruity of *Tahah*'s intended-result-oriented rationale. Nevertheless, if the majority embraces that initial jury instruction, it is manifestly unjust for it to condone the trial judge's prohibition of defense arguments that are based upon the very facts that the trial judge has placed into evidence before the jury and to condone contradictory jury instructions.

At the outset, the trial judge informed the jury that a mistrial "would require the entire trial process to start over," and that "a mistrial is a tremendous expense and inconvenience to the parties, the Court and the taxpayers." But when the defense counsel reiterated for the jury that the consequences of a mistrial would be that "we are going to have to try this case again," the trial judge responded by declaring the defense statement to be "improper argument." Thereupon, the judge issued an admonition to the jury that it was "not to consider whether we would have to try this case again" because that fact was "irrelevant." Of course, as noted, in her initial instructions to the jury, the judge had assigned a great deal of importance (relevance) to that very fact.

56

We have a plethora of cases that state, quite unequivocally, that a prosecutor commits error when he or she argues facts that are *not* in evidence. See, e.g., *State v. Knox*, 301 Kan. 671, Syl. ¶ 4, 342 P.3d 656 (2015) ("A prosecutor commits misconduct by arguing facts not in evidence."). But I am unaware of precedent to support the notion that it is improper for defense counsel to argue facts that the trial court has specifically allowed the jury to hear, i.e., to argue facts that *are* in evidence.

Also, apparently in response to the defense attorney's statement that the defendant was fine with a retrial if the jurors could not agree on a verdict, the judge declared that the jury was "not to consider what happens next." Again, this statement of the law directly contradicted the judge's earlier instruction that the jury should, indeed, consider what might happen next, i.e., that a mistrial would cause tremendous expense and inconvenience for the parties, the court, and the taxpayers. If the trial judge gives the jury two instructions that provide contradictory statements of the law, one would have to conclude that the district court's discretion with respect to at least one of the instructions was guided by an erroneous legal conclusion. If there was a legal error, then we need not ruminate on whether the majority's mythical reasonable person (who agrees with giving the jury diametrically opposed statements of the law) might actually exist, either here or in a parallel universe. An abuse of discretion has occurred.

The majority appears to suggest that the two instructions were not contradictory, in part by creatively stating the facts. For instance, the majority states that the trial court "cautioned the jurors that a mistrial *based on a juror's failure to follow court rules* would be 'a tremendous expense and inconvenience to the parties.'" (Emphasis added.) Slip op. at 32-33. It also quotes from *Tahah*, intimating that the trial judge "'warned jurors of the dangers of a mistrial resulting from their own misconduct.'" Slip op. at 33 (quoting 302 Kan. at 795). To the contrary, however, the initial instruction did not qualify the mistrial it was discussing as being solely based on a juror's failure to follow court rules and it did

57

not limit the recited dangers of a mistrial to be present only when the mistrial was the result of juror misconduct. Indeed, juror-misconduct mistrials often occur at the same point in the trial as hung-jury mistrials, i.e., during jury deliberation, causing precisely the same expense and inconvenience to the parties, the court, and the taxpayers.

Certainly, it would have been better if the district court's coercive instruction had said something like: "A mistrial caused by a juror's failure to follow court rules is an unnecessary expense and inconvenience to the parties and the Court." But that is not what the trial judge said to the jury; it simply referred to "a mistrial." I submit that a limitation on the type of mistrial being discussed by the judge was not intuitively apparent to anyone, much less a layperson.

On the other side, the majority suggests an interpretation of the defense argument as "urging [the jurors] to violate their oaths to return a verdict based solely on the evidence and to instead consider the consequences of a divided verdict." Either the majority is reading a different transcript than I or it has taken the defense attorney's words out of context to creatively manufacture a reason to find no error.

Defense counsel first argued—quite appropriately—that, if a juror had a reasonable doubt about the State's claims, then he or she has to vote not guilty. "And if you have that thought process and you can't be dissuaded from that, then hang on to that verdict." That certainly sounds like an evidence-based argument to me. But then defense counsel went even further, urging the jurors to openly deliberate over the evidence, to-wit:

> "Don't be pig-headed and don't be bull-headed. Think about it. Talk to them. Okay, this is what I think and this is what the experts say, and this is what the evidence shows. Gosh, I am open. Work with me here. But if you have that verdict, hold on to that verdict."

Only then did defense counsel mention that it was going to take 12 jurors and that "[i]f six of you go one way and six another, then we are going to have to try this case again, and that is fine." I cannot perceive of any better way in which a defense counsel could have fulfilled his or her required role of zealous advocate while still respecting the jurors' oaths to base their decision on the evidence. To me, the majority's recharacterization of defense counsel's closing argument is a desperate attempt to find some semblance of support for an untenable position.

In short, the trial judge told the jury a fact was important at the beginning of the trial and then told the jury that same fact was irrelevant at the end of the trial. Either the initial coercive instruction was wrong or the preclusion of defense argument was wrong. One way or the other, error occurred here. Perhaps the error was harmless, but it nevertheless was error.

BILES, J., joins the foregoing concurrence.

* * *

BEIER, J., dissenting: I am persuaded by and would join the majority's opinion in all respects save one, which is, in my view, determinative and requires reversal of Sarah Gonzales McLinn's conviction.

I do not accept the majority's holding on the first guilt phase issue. Premeditation qualifies as a culpable mental state a Kansas prosecutor must prove to obtain a conviction for first-degree murder under K.S.A. 2013 Supp. 21-5402(a)(1). Instruction 13, as McLinn argues and the State at least implicitly concedes, should have included a reference to premeditation as well as intent. Had it included such a premeditation

59

reference, McLinn's jury would have had a complete and accurate roadmap of how to decide whether she "lacked the culpable mental state required as an element" of first-degree murder "as a result of" her dissociative identity disorder. That is exactly what was required by K.S.A. 2013 Supp. 21-5209. Even under the high bar that governs an appeal in which a jury instruction is challenged for the first time, the gap in Instruction 13 requires reversal of McLinn's conviction, vacation of her hard 50 sentence, and remand of this case for a new trial.

At common law, commission of a crime required the concurrence of a particular mens rea and a particular actus reus. See 22 C.J.S., Criminal Law: Substantive Principles § 28 (explaining crime must have an actus reus and, particularly, a mens rea, especially when they have common law origins). Mens rea is the Latin term for the mental state the defendant must possess, and actus reus is the Latin term for the conduct in which he or she must engage. See Black's Law Dictionary 1134-35 (10th ed. 2014) (defining mens rea as "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime"); *State v. Ortega*, 300 Kan. 761, 773-74, 335 P.3d 93 (2014) (stating mens rea is "[state] of mind defendant must have when committing the act"); Black's Law Dictionary 44 (10th ed. 2014) (defining actus reus as "[t]he wrongful deed that comprises the physical component of a crime . . . that generally must be coupled with *mens rea* to establish criminal liability"); *State v. Dinh Loc Ta*, 296 Kan. 230, 242, 290 P.3d 652 (2012) (reiterating "[b]oth a criminal act, an *actus reus*, and a culpable mental state, a *mens rea*, are required for the offense to occur").

Kansas statutes continue this traditional common law pattern for nearly all crimes they define. K.S.A. 2013 Supp. 21-5202 doubly emphasizes the need for evidence of a defendant's mental state:  "Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code. . . . If the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required

unless the definition plainly dispenses with any mental element." K.S.A. 2013 Supp. 21-5202(a), (d).

In addition, Kansas has long included premeditation as an element of the crime of first-degree murder. See K.S.A. 2013 Supp. 21-5402(a)(1); K.S.A. 21-3401(a); K.S.A. 21-3401 (Weeks); K.S.A. 21-401 (Corrick); G.S. 1949, 21-401; R.S. 1923, 21-401; G.S. 1915, 3367; G.S. 1868, ch. 31, sec. 6; Kan. Terr. Stat. 1855, ch. 48, sec. 1. Moreover, the revealing content and structure of this provision has essentially remained unchanged since 1992, including among its elements that the killing be committed "intentionally, *and with premeditation*." (Emphasis added.) Compare K.S.A. 1992 Supp. 21-3401(a)(1) and K.S.A. 2013 Supp. 21-5402(a)(1). This wording and its punctuation make it clear that the legislature regards premeditation as something different and apart from mere intent.

This first-degree murder definition has persisted despite our state's abandonment of the common law *M'Naghten* rule governing the insanity defense in favor of the mental disease or defect defense in 1996, see Comment, *Reduction in the Protection for Mentally Ill Criminal Defendants: Kansas Upholds the Replacement of M'Naghten Approach with the Mens Rea Approach, Effectively Eliminating the Insanity Defense [State v. Bethel, 66 P.3d 840 (Kan. 2003)]*, 44 Washburn L.J. 213, 216-17, 227, 229, 233, 244 (2004); Note, *Insanity Denied: Abolition of the Insanity Defense in Kansas*, 8 Kan. J.L. & Pub. Pol'y 253 (Winter 1999); Spring, *Farewell to Insanity: A Return to Mens Rea*, 66 J.K.B.A. 38 (May 1997), and despite the Legislature's adoption of K.S.A. 2013 Supp. 21-5202(a), effective 2011. See L. 2010, ch. 136, § 13. Common sense dictates that premeditation—regardless of whether it adds something not covered by the culpable mental state of intent that is quantitative, qualitative, or both—is not a feature of the actus reus required for first-degree murder, which is the killing of a human being. This means it must be a feature of the required mens rea of the crime.

I acknowledge the majority's central point that K.S.A. 2013 Supp. 21-5202(a) does not explicitly list premeditation as one of the possible culpable mental states for Kansas crimes. But, most pointedly, it does not exclude it. The majority makes the statutory silence do analytical work for which it is ill-suited. Our frequently invoked maxim— "'[a]n appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there'"—cuts against imposing this burden on that silence, not in favor of it. *State v. Nguyen*, 304 Kan. 420, 422, 372 P.3d 1142 (2016) (quoting *State ex rel. Schmidt v. City of Wichita,* 303 Kan. 650, 659, 367 P.3d 282 [2016]).

In fact, the statute's critical provision allows for the continued application of mental states other than those listed when they have been set out as elements for specific crimes, i.e., in exactly the way that premeditation remains as an element of first-degree murder under K.S.A. 2013 Supp. 21-5402(a)(1). K.S.A. 2013 Supp. 21-5202(a), which is the fulcrum upon which the majority attempts to rest, says: "A culpable mental state *may* be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'" As legions of our cases have long established, the word "may" is permissive, not mandatory. See, e.g., *Hill v. Kansas Dept. of Labor*, 292 Kan. 17, 21, 248 P.3d 1287 (2011) (contrasting "permissive word 'may'" with "directory language such as 'shall' or 'must'"); *State v. Engelhardt*, 280 Kan. 113, 121, 119 P.3d 1148 (2005) (statute's use of "'may'" "plainly permissive"). Although a culpable mental state *may* be proved by evidence of intentional, knowing, or reckless behavior, it does not *have* to be.

The rest of K.S.A. 2013 Supp. 21-5202 also does nothing to undercut the permissive tone of its Subsection (a). In fact, overall, a natural, holistic reading of its language reinforces the nonexclusivity of the list of three culpable mental states. Subsection (b) merely sets out the hierarchy among the three; it says nothing about other

mental states that may be included in the various statutes defining Kansas crimes. Subsection (c) merely provides that proof of a higher degree of culpability among the three necessarily includes proof of a lower degree. Subsection (d), as noted above, requires that some mental state be proved even if the definition of the crime does not include one, unless the definition of the crime "plainly dispenses with any mental element." And Subsection (e) states: "If the definition of a crime does not prescribe a culpable mental state, but one is nevertheless required under subsection (d), 'intent,' 'knowledge' or 'recklessness' suffices to establish criminal responsibility." These subsections tell us that not only does proof of a particular mens rea continue to be important in Kansas but also a specific statute defining a crime can always trump Subsection (a) on exactly what that mens rea is. The nonexclusive list in Subsection (a) is merely the fallback when the defining statute does not include a culpable mental state. Subsections (f) and (g) do not mention the three culpable mental states listed in Subsection (a) at all; they merely set out the rules for which elements of a crime are controlled by any culpable mental state made part of a crime's definition. And, finally, Subsections (h), (i), and (j) define the three mental states listed in Subsection (a).

I believe that the language of K.S.A. 2013 Supp. 21-5202 tells us what we need to know to dispose of this jury instruction issue in McLinn's favor. But, even if the statute is considered ambiguous, available legislative history shores up my interpretation or construction. See *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 850, 397 P.3d 1205 (2017) (if statute silent, ambiguous, legislative history may be consulted by court to determine meaning). The House and Senate reports on the recodification of the Kansas criminal code, of which the new section 21-5202 was a part, do not contain helpful information. But it is significant that the report that underlay the recodification, Kansas Criminal Code Recodification Commission, 2010 Final Report to the Kansas Legislature by Tom Stacy and Ed Klumpp, did nothing to rule out premeditation as a culpable mental state.

63

The report indicates the list in K.S.A. 2013 Supp. 21-5202(a) was intended to be neither exhaustive nor exclusive. This is evidenced by its suggestion to strike "knowingly" but not "premeditation" from the first-degree murder statute, a suggestion apparently adopted by the Legislature. In addition, although the report's authors expressed reluctance to embrace judicially added "culpable mental states," they did not oppose the idea entirely; they simply stated that they sought to avoid "unnecessary" additions. Far from being omitted as "unnecessary," premeditation retained its historical status as an essential element of the crime with which McLinn was charged.

Given my conclusions that premeditation must be a feature of the mens rea of first-degree murder under K.S.A. 2013 Supp. 21-5402(a)(1) and that it qualifies as a culpable mental state that may be negated by a successful mental disease or defect defense, I turn to my one remaining bother with the majority's treatment of this issue. As mentioned, the content and structure of the definition of the crime obviously distinguishes premeditation from mere intention; if there were no distinction, there would be no reason for the Legislature to mention premeditation at all. See *State v. Keel*, 302 Kan. 560, 574, 357 P.3d 251 (2015) (court presumes Legislature does not include meaningless provisions, language in statutes). And I disagree with the majority's limitation of this distinction to the temporal.

Although the majority is correct that several of our recent cases have emphasized that the time it takes a killer to premeditate is longer than the time it takes him or her to intend, this emphasis often has been nothing more than a function of the particular type of error alleged in the case before us. In short, when a defendant has argued that a prosecutor's argument was problematic because it stated or implied that premeditation could occur instantaneously, then this court, understandably, would focus on that complaint. See, e.g., *State v. Phillips*, 299 Kan. 479, 504-05, 325 P.3d 1095 (2014); *State*

64

*v. Hall*, 292 Kan. 841, 850-52, 257 P.3d 272 (2011); *State v. Cosby*, 285 Kan. 230, 248, 169 P.3d 1128 (2007). This focus did not mean that timing is the only distinguishing mark of premeditation when it is compared with intent.

Others among our cases have repeatedly recognized that premeditation has other hallmarks as well. See, e.g., *State v. Betancourt*, 301 Kan. 282, 302, 342 P.3d 916 (2015); *State v. Smith-Parker*, 301 Kan. 132, 153, 340 P.3d 485 (2014). And we have recently approved of a jury instruction listing circumstances that are among those eligible for consideration in drawing an inference that premeditation existed. See *State v. Bernhardt*, 304 Kan. 460, 470-72, 372 P.3d 1161 (2016). Those factors are: "(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, [and] (5) dealing of lethal blows inflicted after the deceased was felled and rendered helpless." 304 Kan. at 464. None of these circumstances is limited to the length of a defendant's pre-killing deliberation.

My position that premeditation differs qualitatively as well as quantitatively from intent also finds support in decisions from several of our sister jurisdictions. See *State v. Boyston*, 231 Ariz. 539, 551, 298 P.3d 887 (2013) (restating Arizona's rule of law "[t]o prove premeditation, the state must establish actual reflection and *more than mere passage of time*") (Emphasis added.); *People v. Halvorsen*, 42 Cal. 4th 379, 419, 64 Cal. Rptr. 3d 721, 165 P.3d 512 (2007) (verdict of deliberate and premeditated first-degree murder requires more than showing intent to kill); *Soria v. State*, 933 S.W.2d 46, 60 (Tex. Crim. App. 1996) (stating "deliberate conduct is something more than intentional, *but less* than premeditation") (Emphasis added.).

This brings me to reversibility. Given the lack of an objection from the defense in the district court, as the majority observes, the legal error I see in Instruction 13 does not

demand reversal unless I am "'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *State v. Knox*, 301 Kan. 671, 680, 347 P.3d 656 (2015).

I am so convinced on the unique record before us.

The expert evidence of the existence of McLinn's psychiatric problem and its likely impairment of her ability to engage in rational thought was abundant. The State's expert did not challenge the defense expert's thoroughness or professionalism or, indeed, her diagnosis. He merely expressed doubt that the illness the defense expert described in such detail would affect McLinn's ability to "form an intent to kill." Like Instruction 13, this doubt did not address premeditation at all.

I conclude that Instruction 13's omission of premeditation as an element the jury had to consider when evaluating McLinn's only defense had to have what law professors call "bite." In the language of the rest of us, it mattered. Its omission of premeditation prevented the jury from considering whether McLinn's illness negated her ability to form a culpable mental state required by the definition of first-degree murder in K.S.A. 2013 Supp. 21-5402(a)(1). This error merits a new trial.